COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Felton, Judges Benton, Elder, Humphreys, Clements, Kelsey, McClanahan,
           Haley, Petty and Beales
Argued at Richmond, Virginia


HOWARD Z. GARNETT, JR.

                                          OPINION BY
v.      Record No. 3027-04-2         JUDGE ELIZABETH A. McCLANAHAN
                                       APRIL 10, 2007
COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF MADISON COUNTY
Daniel R. Bouton, Judge

W. Todd Watson (Hargett & Watson, on brief), for appellant.

Alice T. Armstrong, Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


A jury convicted Howard Z. Garnett, Jr. of rape, abduction with intent to defile, assault

and battery on a family or household member (third or subsequent offense), and animate object

penetration. Garnett contends the trial court erred in denying his motion for a new trial on the

grounds that the Commonwealth failed to disclose exculpatory evidence, in the form of tape

recordings and transcripts of the victim's statements, in violation of Brady v. Maryland, 373 U.S.

83 (1963). A panel of this Court held the Commonwealth's failure to disclose the victim's

verbatim statements constituted a Brady violation and reversed his convictions in an unpublished

opinion. We granted a petition for rehearing *en banc* and stayed the mandate of the panel

decision. Upon rehearing *en banc*, we affirm the trial court.

## I.  BACKGROUND

On the morning of July 24, 2003, the victim went to Garnett's barn to retrieve some belongings.[1]  When Garnett appeared, she attempted to leave but he grabbed her truck keys out of her hand.  Garnett told her he wanted to return some things to her.  The victim followed him into the house and then the barn, but he refused to return her keys.  Once in the barn office, Garnett physically blocked the exit and prevented the victim from leaving.  He pushed her up the stairs into a secluded area where he verbally and physically attacked her, ultimately raping her.  Garnett then drove the victim home in her truck and left.

The victim reported the rape later that afternoon to the Madison County Sheriff's Office and submitted a handwritten statement.  Deputy Hill observed scratches and bruises on her body, redness around her neck, her clothing was dirty and in disarray, her face was red and puffy, her voice was "very broken and soft," and the frame of her glasses was bent.  Hill took her to the hospital for a sexual assault examination, and interviewed her that night with Investigator Michael.  The victim gave another statement on July 31 in which she described Garnett's sexual assaults of January 19 and April 29, 2003.[2]  Both interviews were recorded and transcribed.  The victim also submitted a handwritten statement, and disclosed additional details regarding the alleged assaults to the Commonwealth while preparing for trial.  Some of these statements conflicted with her preliminary hearing testimony.

---

[1] The victim lived with Garnett from July 2001 to August 2002.  Later in 2002, she terminated their relationship because she did not want "to be involved in a relationship that had violence and aggression."  Garnett was charged with domestic assault against the victim but those charges were dismissed in September 2001 because she was non-cooperative.  She testified that his family urged her not to press charges and he promised to change.  She also withdrew a protective order she had against him.

[2] The offenses for which Garnett was convicted occurred on July 24, 2003.  The jury acquitted Garnett on charges for the assaults allegedly occurring on January 19, 2003, and April 29, 2003.

Before trial, Garnett requested the tape recordings and transcripts of the victim's statements to police, arguing the evidence was exculpatory and could be used to impeach her credibility. The Commonwealth provided Garnett with summaries of her statements, which also specifically described the inconsistencies with her preliminary hearing testimony, but it did not release the recordings and transcripts. At the pretrial hearing, the Commonwealth represented that it had disclosed all exculpatory statements and that there were no inconsistencies between the victim's two recorded statements. Garnett accepted the Commonwealth's representations and withdrew his request for the court to conduct an *in camera* review of the statements. Garnett nevertheless persisted in his request for the recordings, contending that the "manner" in which the victim "articulate[d]" her statements was "potentially exculpatory." The trial court denied the request but directed the Commonwealth's attorney to review the recorded statements prior to trial and disclose further exculpatory evidence, if any.[3]

---

[3] The trial court stated:

> Based on the representations of the Commonwealth's attorney concerning what is covered by those statements, and based on the acceptance of those representations by the defense, the Court will simply confirm that the Commonwealth has a continuing duty to disclose any exculpatory evidence that exists with regard to either of those two statements. The Court will direct the Commonwealth's attorney to review them again prior to trial and disclose any further information to the defense that it deems exculpatory, in light of the hearing that we've conducted. Specifically, Mr. Webb, if, in fact, upon subsequent review there are embellishments, additions or supplemental factual statements and assertions that would be exculpatory as opposed to further explanation, . . . those would be subject to disclosure. Now based on what you said, I'm not suggesting there are any such statements, and it may well be that there are not, but we'll simply make that observation that that is one area which we find the defense motion to be well-taken, so we'll simply direct that you do that.

After he was convicted, Garnett filed a motion to set aside the verdict. He maintained that the Commonwealth violated the mandates of Brady by responding to his discovery request for the victim's verbatim statements by providing only typed summaries of the statements. Before ruling on Garnett's motion, the trial court reviewed *in camera* the recordings and transcripts of the statements and compared them to the typewritten summaries. The court found that the victim's statements revealed material inconsistencies in her testimony, but that the Commonwealth sufficiently disclosed the exculpatory material. The court further held that, by virtue of the Commonwealth's disclosure of the summaries in lieu of "the exact words that [she] uttered" in their entirety, Garnett was not prejudiced under Brady and not entitled to a new trial.

## II. ANALYSIS

"A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused." Youngblood v. West Virginia, 126 S. Ct. 2188, 2190 (2006). "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). The Commonwealth's duty to disclose exculpatory information includes evidence that can be used to impeach prosecution witnesses. United States v. Bagley, 473 U.S. 667, 676 (1985); Youngblood, 126 S. Ct. at 2190; Robinson v. Commonwealth, 231 Va. 142, 150, 341 S.E.2d 159, 164 (1986) ("The impeachment value alone makes the information exculpatory.").

Garnett contends the victim's verbatim statements constituted impeachment evidence the Commonwealth was required to disclose under Brady. The Commonwealth argues Garnett failed to establish it withheld exculpatory evidence and failed to establish that he suffered prejudice sufficient to require a reversal of his convictions.

- 4 -

A. The Commonwealth made the required disclosure of the <u>Brady</u> material in the specific summaries of the victim's statements.

Once a <u>Brady</u> claim is asserted, and a dispute arises as to whether information is indeed exculpatory, the trial court has the discretion to review the evidence *in camera* and assess whether the Commonwealth has favorable evidence which, if not disclosed, would prejudice the defendant. <u>Bowman v. Commonwealth</u>, 248 Va. 130, 135, 445 S.E.2d 110, 113 (1994); <u>Lemons v. Commonwealth</u>, 18 Va. App. 617, 621, 446 S.E.2d 158, 161 (1994) ("If in doubt about the exculpatory nature of the material, a prosecutor should submit it to the trial court for an *in camera* review to determine if it is exculpatory and should be disclosed.").

Prior to trial, Garnett requested all exculpatory materials, including the tape recordings and transcripts, but then withdrew his request for an *in camera* review at the pretrial hearing. In response to Garnett's motion to set aside the verdict after his conviction, the trial judge conducted the *in camera* review and found:

> The Commonwealth made two separate disclosures regarding statements of the victim. The first disclosure was---was very specific and it revealed material inconsistencies. The second disclosure was even more detailed. It described in a comprehensive way *exactly* what the victim said in her statements to Investigator Michael, and the Court has compared the disclosures that took place and the statements that were actually provided to the in-camera materials that the Commonwealth has delivered to the Court, and here, in the Court's view, *all of the exculpatory evidence and the impeachment materials was actually provided to the defense*. The Commonwealth even points out in one of its disclosures, very clearly, what the inconsistencies actually consist of. There's something of a road map to impeachment, so, in the Court's view, the disclosure was sufficient when one compares what was disclosed to the in-camera material.

(Emphasis added). Accordingly, the trial court ruled that the statements were indeed exculpatory but that there was no <u>Brady</u> violation because the Commonwealth sufficiently disclosed the exculpatory evidence—providing the defendant "a road map to impeachment" through its summary disclosures.

Contrary to Garnett's argument, <u>Brady</u> does not require disclosure of the recordings or transcripts. <u>See</u> <u>United States v. Grunewald</u>, 987 F.2d 531, 535 (8th Cir. 1993) (government complied with <u>Brady</u> by providing defendant typed summaries of interview notes instead of the available handwritten notes containing material favorable to defendant); <u>United States v. Phillips</u>, 854 F.2d 273, 278 (7th Cir. 1988) (government complied with <u>Brady</u> by providing defendant with exculpatory evidence in the form of detailed summaries); <u>United States v. Van Brandy</u>, 726 F.2d 548, 551-52 (9th Cir. 1984) (same). Garnett was provided the substance of the victim's statements, and he attacked her credibility as to each inconsistency. He thoroughly cross-examined the victim, challenging her recollection of the facts regarding the rape including how long she was in the barn, whether he sexually assaulted her orally, and why she was willing to follow him into the secluded barn after he had previously assaulted her. Garnett also pointed out the lack of corroborating evidence. He questioned the victim about when she terminated her intimate relationship with him, the extent of their business relationship, and her possible motive for testifying falsely.

We recognize that "the more prudent and expeditious route would have been for the government to provide" the recordings or transcripts. <u>Grunewald</u>, 987 F.2d at 535; <u>see</u> <u>Lemons</u>, 18 Va. App. at 621-22, 446 S.E.2d at 161. However, given the specificity of the disclosures, Garnett was able to carefully attack the victim's account in an effort to impeach her regarding her prior inconsistent statements. We do not believe the verbatim statements would have provided Garnett with "such compelling cross-examination as to render an acquittal more likely." <u>United States v. Wadlington</u>, 233 F.3d 1067, 1076-77 (8th Cir. 2000) (where defendant "was already aware of the substance of the government witnesses' exculpatory and impeaching statements prior to trial, he cannot establish a <u>Brady</u> violation"); <u>see</u> <u>Van Brandy</u>, 726 F.2d at 552 (defense witness "was exhaustively cross-examined" and "his credibility was thoroughly

- 6 -

questioned" based on government's disclosure of exculpatory evidence in the form of detailed summaries).

Upon our review of the record, including an *in camera* comparison of the verbatim statements to the disclosed summaries, we cannot say that the trial court erred in ruling that the Commonwealth did not suppress any Brady material. Garnett failed to prove a Brady violation because the Commonwealth disclosed the exculpatory evidence. See Wadlington, 233 F.3d at 1076; Grunewald, 987 F.2d at 535; Phillips, 854 F.2d at 278: Van Brandy, 726 F.2d at 551-52; see also Basden v. Lee, 290 F.3d 602, 610-11 (4th Cir. 2002) (no Brady violation where defendant had access to most of the information contained in nondisclosed report of witness' interview).[4]

---

[4] The dissent hypothesizes the police conducted at least one additional interview with the victim between the recorded interviews conducted on July 24 and July 31, 2003, and on that basis asserts that Garnett's convictions should be reversed under Brady. Neither the record nor the law supports that assertion. Moreover, even though we now address it, this argument was not made by Garnett on appeal and is thus waived pursuant to Rule 5A:18.

The dissent relies on a discrepancy in the victim's July 24 and July 31, 2003 interviews. In her July 24th interview, she stated Garnett raped her a total of "two or three times," and she thought one of those rapes occurred at the end of May 2003. The July 31st interview was conducted in reference to the victim's allegations that two earlier rapes occurred on January 19, 2003 and April 29, 2003. The discrepancy between the April and May dates did not give rise to a Brady violation. First, the fact the victim initially indicated that one of the three alleged rapes occurred in May was disclosed to Garnett in the Commonwealth's summaries of exculpatory evidence. Second, the victim's subsequent representation as to the specific dates of the two earlier alleged rapes was not necessarily the product of a third interview. Thus, assertions that the police conducted a third interview with the victim and that it "may have contained 'potentially exculpatory evidence'" amount to mere "speculation," which is insufficient to establish a Brady violation. Ramdass v. Commonwealth, 246 Va. 413, 420, 437 S.E.2d 566, 570 (1993), vacated on other grounds, 512 U.S. 1217 (1994), cert. denied after remand, 514 U.S. 1085 (1995); see Lowe v. Commonwealth, 218 Va. 670, 679, 239 S.E.2d 112, 118 (1977) ("critical basic fact" may not be assumed by appellate court where not demonstrated in the record and "conjecture" is insufficient to establish a Brady claim); see also United States v. Agurs, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish 'materiality' in the constitutional sense."); Juniper v. Commonwealth, 271 Va. 362, 394, 626 S.E.2d 383, 404 (2006) (Brady motion may not be used as "a speculative search for evidence" (internal quotation marks omitted)); Hughes v. Commonwealth, 18 Va. App. 510, 516, 446 S.E.2d 451, 461 (1994) ("[s]peculative allegations" of "the presence of favorable material"

- 7 -

B. Garnett was not prejudiced by the Commonwealth's disclosure of the summaries of the victim's statements, instead of the verbatim statements.

Garnett also failed to show he was prejudiced by the nondisclosure of the victim's verbatim statements, the third element of a <u>Brady</u> claim, in light of the Commonwealth's disclosure of the summaries of the exculpatory evidence. <u>See</u> <u>Deville v. Commonwealth</u>, 47 Va. App. 754, 756-57, 627 S.E.2d 530, 532 (2006); <u>see also</u> <u>Lemons</u>, 18 Va. App. at 620-22, 446 S.E.2d at 160-61.

In the context of <u>Brady</u>, prejudice is shown if the nondisclosed evidence favorable to the accused is material. <u>Robinson</u>, 231 Va. at 150-51, 341 S.E.2d at 164; <u>see also</u> <u>Deville</u>, 47 Va. App. at 756-57, 627 S.E.2d at 532; <u>Lemons</u>, 18 Va. App. at 620-22, 446 S.E.2d at 160-61. Such "'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Robinson</u>, 231 Va. at 151, 341 S.E.2d at 164 (quoting <u>Bagley</u>, 473 U.S. at 682); <u>see</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995) (nondisclosure of evidence favorable to the accused "does not amount to a <u>Brady</u> violation, without more"); <u>Hillman v. Hinkle</u>, 114 F. Supp. 2d 497, 502 (E.D. Va. 2000). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." <u>Bagley</u>, 473 U.S. at 678; <u>see</u> <u>Lovitt v. Warden</u>, 266 Va. 216, 244-45, 585 S.E.2d 801, 817-18

---

is insufficient under <u>Brady</u>). Third, even if the police had conducted additional interviews with the victim, "there is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.'" <u>Agurs</u>, 427 U.S. at 109 (quoting <u>Moore v. Illinois</u>, 408 U.S. 786, 795 (1972)); <u>see</u> <u>Ramdass</u>, 246 Va. at 420, 437 S.E.2d at 570 ("[T]here is no general constitutional right to discovery in a criminal case, and <u>Brady</u> did not establish one." (citing <u>Lowe</u>, 218 Va. at 679, 239 S.E.2d at 118)); <u>Goins v. Commonwealth</u>, 251 Va. 442, 456, 470 S.E.2d 114, 124 (1996) (same). Disclosure under <u>Brady</u> extends only to exculpatory evidence. <u>Brady</u>, 373 U.S. at 87.

(2003), <u>cert</u>. <u>denied</u>, 541 U.S. 1006 (2004).[5] "In other words, [appellant] must show that when the case is evaluated in the context of the entire record, including the [purportedly] omitted evidence, a jury would have entertained a reasonable doubt" as to appellant's guilt. <u>Soering v. Deeds</u>, 255 Va. 457, 464, 499 S.E.2d 514, 517 (1998).

We thus consider the cumulative effect of the disclosure of the summaries instead of the recordings and transcripts, to determine on appeal whether such nondisclosure was material and resulted in prejudice. <u>See</u> <u>Lovitt</u>, 266 Va. at 245, 585 S.E.2d at 818; <u>Robinson</u>, 231 Va. at 152, 341 S.E.2d at 165. The crux of the convictions involved what transpired in the barn, not before or afterwards. The evidence established that Garnett pushed her inside the barn, prevented her from exiting, ignored her protests to stop groping her, shoved her upstairs to a secluded area, sexually assaulted, and then raped her. Her physical appearance and demeanor at the police station corroborated her recent complaint. While denying that any assault took place, the defendant conceded he was present with the victim on the day of the offense at the barn, that they were in the barn, and that the victim's clothes should have been dirty.[6]

_____

[5] As the United States Supreme Court later explained in <u>Strickler</u>,

> the term "<u>Brady</u> violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence— that is, to any suppression of so-called "<u>Brady</u> material"— although, strictly speaking, there is never a real "<u>Brady</u> violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

<u>Strickler</u>, 527 U.S. at 281 (footnote omitted).

[6] The defendant admitted that he spoke with the victim when she came to his property, that they went to his mother's house, and then into the barn. He denied assaulting her or touching her. He conceded "she should have been dirty and muddy because . . . these mats were right on this red soil and uhm she had fell . . . and that's the end of it." When asked if he had sexual relations with the victim that day, the defendant said, "No sir I'm to [sic] wore out from my present girlfriend . . . I haven't been with [the victim] over a month and a half to two months . . . ."

Many of the inconsistencies between the victim's statements and her preliminary hearing testimony concern matters unrelated to the charges or matters that occurred outside the barn.[7] Garnett cross-examined the victim regarding how long she was detained in the barn and regarding any possible bias. Garnett took full advantage of all the inconsistencies the Commonwealth specifically identified and extensively cross-examined the victim on each charge. By acquitting Garnett of two of the charges against him, the jury clearly rejected some of the victim's testimony.

The Commonwealth's failure to provide the victim's verbatim statements, standing alone, was not "of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 108 (1976). We have reviewed the evidence presented at trial and considered what effect the verbatim statements might have had on the jury's verdict. As in Fitzgerald v. Bass, 6 Va. App. 38, 55, 366 S.E.2d 615, 624-25 (1998) (*en banc*), "we believe that, given the extent to which [the victim's] credibility was impeached, it is doubtful that additional evidence in this regard would have made a difference in the jury's opinion of [her] credibility." On this record, we cannot say there is a reasonable probability that had the verbatim statements been disclosed, the outcome of the trial would have been different. See Lemons, 18 Va. App. at 621-22, 446 S.E.2d at 161 (conviction affirmed where we were "unable to conclude to a reasonable degree of probability that the disclosure of the statement would have affected the outcome of the case"); Robinson, 231 Va. at 152, 341 S.E.2d at 165 (Supreme Court compared evidence at trial with what defendant claimed could have been presented had exculpatory evidence been disclosed earlier and found "there is no reasonable probability that an earlier

---

[7] These facts included when the victim ended her intimate relationship with Garnett, whether Garnett raped her in May, the number of times he previously sexually assaulted her, whether on the day of the offenses they entered the house before going to the barn, and to whom she stated she did not know whether she had been subjected to an oral sexual assault.

disclosure would have resulted in a different outcome."); <u>Deville</u>, 47 Va. App. at 758 n.2, 627

S.E.2d at 532 n.2 (we affirmed trial judge's determination that even if disclosed, the evidence

would not have affected the verdict); <u>see also</u> <u>Agurs</u>, 427 U.S. at 108; <u>United States v. Ellis</u>, 121

F.3d 908, 918 (1997); <u>Wadlington</u>, 233 F.3d at 1076.

Accordingly, we affirm Garnett's convictions.

<u>Affirmed.</u>

Haley, J., with whom Benton and Elder, JJ., join, dissenting.

We respectfully dissent.

## I.

This dissent shall examine the facts in the continuum of the relationship between appellant and complainant, because:

> The proper standard of materiality [in Brady evaluation] must reflect our overriding concern with the justice of the finding of guilt.  Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt.  It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. *This means that the omission must be evaluated in the context of the entire record.*  If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. *On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.*

United States v. Agurs, 427 U.S. 97, 112-13 (1976) (emphasis added), cited with approval in Dozier v. Commonwealth, 219 Va. 1113, 1116-17, 253 S.E.2d 655, 657 (1979).

In Lovitt v. Warden, 266 Va. 216, 585 S.E.2d 801 (2003), the Supreme Court of Virginia recognized the foregoing italicized considerations.  There, the Court stated that a Brady "due process analysis requires consideration on *an item-by-item basis* whether the evidence at issue was exculpatory.  However, the determination whether undisclosed exculpatory evidence was material must be made by considering its *cumulative effect*."  Id. at 245, 585 S.E.2d at 818 (emphasis added).

## II.

## FACTS

With that standard, a detailed summary of relevant facts in the entire record is necessary. It should be remembered that appellant was indicted and tried on three charges of rape, one on July 24, 2003, one on January 19, 2003, and one on April 29, 2003.

A.

The July 24, 2003 Incident

Complainant is a 53-year-old registered nurse "in labor and delivery, nursery and postpartum" at Fauquier Hospital. Complainant moved from Delaware[8] to Madison County, Virginia, in 2001. That year she purchased a tract of land from, and adjoining property owned by, appellant and appellant's mother. She wished to build a home on the property and develop a portion of it for resale. In May 2001, complainant began an "intimate relationship" with appellant and moved into his residence.

In July 2001, complainant filed a complaint under oath, charging appellant with assault and battery. That charge was dismissed, because as the Commonwealth's Attorney wrote, complainant was "non-cooperative, stating that she grabbed him first, and that there was no violent contact between her and the defendant at that time." In short, complainant told the Commonwealth Attorney she had lied while under oath when filing the complaint for the arrest warrant.

Complainant continued to live with appellant until August 2002, when her home was completed. After she moved into her home, part of which appellant had constructed on the land she purchased from him, they were "neighbors." Appellant continued living with his mother 200 to 300 yards from complainant. Appellant and complainant continued their consensual sexual relationship until November 2002.

According to complainant, on July 24, 2003, she drove her truck to the barn, which was located between appellant's home and complainant's home, to pick up "personal belongings" she had stored there. These included garden hoops, a tiller, stall mats, tools, building supplies,

_____

[8] On cross-examination complainant answered she had moved to Virginia from "California."

- 13 -

and parts of a dismantled greenhouse. When she arrived at 8:30 a.m., appellant was present and a VDOT paving crew was working on the road in front of the barn. Appellant, by "squeezing her hand" and "bending her hand" back for thirty seconds, took her truck keys, and, despite her requests, refused to return them. After taking her truck keys, complainant claims appellant "started to walk on towards his house . . . and [she] followed him all the way to his house."

She followed appellant into the house in which "he gathered a couple of mugs and gave them to me. They were my property." During this time in the house complainant knew appellant's mother was present, but made no complaint to his mother about appellant taking her keys from her by force and refusing to return them. Complainant testified they spent "less than five minutes" in the house. Then, "He walked out the door and I followed him" back to the barn. She was not "physically restrained" going to the house or back to the barn.

At the barn, appellant made "advances" towards her, but she nonetheless entered the barn to get her property. In the barn, complainant claimed appellant "pushed me up the stairs and then we went to the back of the barn," where appellant allegedly raped her.[9] He pushed her "forward over a [waist-high] wall and pulled [her] shorts down." When asked if appellant ejaculated she answered: "I don't know. I don't think so." She testified that she either did not know, or could not remember, if appellant orally sexually assaulted her. She said the rape occurred "around noon," that is, 2½ hours after she initially arrived at the barn. She claimed appellant threatened her life and appellant was "yelling and screaming." Also, she testified, "I was screaming and yelling the whole time it was going on . . . and hoping the people out[side] who were working in the front would hear."

_____

[9] Apparently the barn is two-storied, with a "milking parlor" on the first floor, and open space on a second floor.

- 14 -

On direct examination the following exchange occurred, referring to the time of the assault and immediately thereafter:

Q. Was there anybody else around the barn at that time?

A. There was a VDOT work crew working on the road in front of the barn.

\* \* \* \* \* \* \*

Q. Why didn't you run out to the paving crew? Were they still outside the barn?

A. I don't know. . . . By that time I had no idea.

*After* the attack, complainant testified that she and appellant "were in and out of the barn" bringing out her stall mats. Appellant "brought my truck around and loaded my stall mats into it." He then drove complainant to her home in her truck and "left her keys" in that truck. Complainant entered her home, did not call 911, "got a drink of water and I went to the police station." She stayed in her home "maybe five minutes."

Complainant's testimony revealed that since Thanksgiving 2002, appellant had aided her in various business enterprises. He had advised her on the purchase of plants, tilled the ground and bedded plants on her property - plants complainant wished to sell. Complainant may have also purchased garden supplies associated with the venture in the name of "Garnett's Gardens." Complainant purchased a dismantled greenhouse and she and appellant transported the components, to be re-erected near the barn. In March, April and May 2003, complainant also had a used furniture business located in a booth at The Emporium,[10] and appellant hauled furniture to and from the same. Appellant's mother lived with complainant in her home for approximately a week in January 2003, following a debilitating injury. In the spring of 2003,

---

[10] The Emporium apparently is a form of market in which various vendors can rent space.

- 15 -

complainant sought to subdivide her property and sought appellant's advice with respect to the same, including lay-out, septic fields, and other information.

In addition to the foregoing business and semi-business relationship with appellant, documentary evidence showed that on June 23, 2003, complainant entered into a contract to purchase the home of appellant and his mother for $135,000. That contract was terminated by a release between the parties. Complainant signed the release on July 16, 2003, appellant signed on July 24, (the day of the incident), and appellant's mother signed on July 25.

Further, in February 2004, more than six months after the July 24 incident, complainant sought to obtain 1.87 acres from appellant and his mother, apparently in connection with complainant's desire to subdivide her property, by a boundary line adjustment deed. She retained counsel who prepared a deed to that effect and forwarded it on February 9, 2004, with a request it be signed. That agreement was not consummated, apparently because of litigation concerning a deed of trust on that property.

In summary, complainant testified that on July 24, 2003, she went to the barn at 8:30 a.m., had her keys then taken as a result of 30 seconds of violence, walked up to appellant's house, stayed there less than 5 minutes, walked back to the barn, and the attack occurred around noon. After the attack, she and appellant reentered the barn and loaded three stall mats in her truck; he drove her home; she got a drink of water, and after staying in her home "maybe five minutes," went to the police. She saw Deputy Sheriff Shawn Hill.

Deputy Hill testified on direct examination:

> Q. Do you know approximately what time it was that you encountered [the complainant]?
>
> A. [The complainant] came into the office at approximately 2:30 to 2:40 that afternoon.

*     *     *     *     *     *     *

Q. What was the complaint that you had from [her]?

A. Okay. Initially, [the complainant] stated that she had been assaulted . . . and then further, approximately fifteen (15) to twenty (20) minutes after that, she informed me that she had been sexually assaulted.

When asked on cross-examination to explain the apparent time gap between 8:30 a.m., when she arrived at the barn, and her appearance at the police station, complainant responded that she believed that appellant held her "until two o'clock in the afternoon."[11]

When she did arrive at the police station, Deputy Hill testified that complainant's clothing was "dirty" and "in a disarray"; she had "several scratches and bruises"; and "some redness and puffiness to her face." Upon learning of her claim of sexual assault, Hill took her to the emergency room at the University of Virginia Hospital.

At the hospital, complainant saw Sandra Lee Annan, a sexual assault nurse examiner. She described complainant's clothes as "sort of dusty, dirty," and detailed bruises or scratches on her hands and knees. By using a dye procedure to discern abrasions not visible to the eye, she found "two small dots" inside the outer lips of the vagina, which were consistent with sexual intercourse. Such abrasions will remain detectable for up to three days after intercourse. She found no bruises or scratches on her breasts, back, palms of her hands, elbows, forearms, ears, or from her waist down to the front of her knees.

The nurse further obtained: (1) swabs from complainant's ears, neck, cheeks, buttocks, thighs, and vaginal area; (2) complainant's clothes; and (3) the results of a comb-through of complainant's pubic hair. DNA analyses showed: (1) no sperm, seminal fluid or blood was found on the vaginal/cervical areas, thighs/external genitalia, perianal/buttocks, left ear, right ear, cheeks or neck. The DNA profiles from swabs behind the left ear and cheeks and neck were

_____

[11] In a written "voluntary statement" made to the police on July 24, 2003, complainant wrote that appellant "kept me at the barn against my will for 5 hours."

- 17 -

consistent with a mixture of complainant and appellant components; (2) no evidence of blood or seminal fluid was found on complainant's tank top or shorts; and (3) the results of the pubic hair combing showed no hair except that of complainant.

Investigator Donnie Michael took a written statement from complainant on July 24, 2003, and interviewed her. Investigator Michael again interviewed her on July 31, 2003. Both interviews were audio taped and transcribed. These allegedly were the only two interviews of complainant by the Commonwealth.

On July 28, 2003, appellant voluntarily went to the Sheriff's department, waived his Miranda rights, and gave an interview. A transcript of his statement was introduced in evidence. Appellant denied raping complainant at any time. Appellant stated that, on July 24, 2003, he and complainant discussed the greenhouse, walked up to his mother's house, had coffee and conversation with her for ten minutes, walked back to the barn, discussed the purchase of a tractor, tried to get a tiller started they used on their joint garden project, and together pulled out of the barn and loaded dirty stall mats into the back of her truck. During this loading, appellant stated, complainant slipped and fell and he picked her up. A transcript of this interview was introduced at trial by the Commonwealth.

The jury found appellant guilty of the July 24, 2003 rape and related crimes.

B.

The Incidents of January 19, 2003 and April 29, 2003

As noted above complainant allegedly gave two transcribed (and audio-taped) statements, one on July 24 and one on July 31, both conducted by Investigator Michael. At the end of the July 24 interview the following exchange occurred:

Q. Has he ever done this to you before?

A. Yes

Q. He's raped you before?

A. Yes

Q. Have you reported it?

A. No

Q. How many times has he raped you?

A. Uhm he's probably forced himself on me two or three times now.

Q. And do you know when that occurred?

A. Aah well the last time it happened I think it was in the month of end of May.

Q. Of this year?

A. Yeah

In the interview, complainant mentioned no dates of these assaults except "end of May" and specifically did not mention any assaults on January 19 or April 29, 2003.

During the July 31 interview, Investigator Michael asked complainant the following question: "The first one being January 19, 2003 can you tell me what happened and where this happened?" Complainant said that appellant raped her on that date, that she went to the doctor but did not tell him she had been raped, and that she had taken pictures of herself on that date which she provided Investigator Michael. The interview continues: (Q) "O.k. you also told me of a date on April. April 29[th]." (A) "April 29[th], right." Complainant told Investigator Michael appellant raped her on that date, but she did not report it to the police or seek medical assistance. She further told Investigator Michael that appellant ejaculated inside her on both January 19 and April 29, 2003.

At trial complainant testified appellant assaulted and raped her in her home on January 19, 2003, and on April 29, 2003. She produced photographs of herself, which she claims she

took of herself on January 19, and photographs she (and a friend) took on May 3, 2003, purporting to document the injuries she received from the assaults. Complainant maintained she did not report either of these rapes to the police because appellant threatened to kill her "and bury [her] on the property."

The jury found appellant not guilty of the alleged rapes on January 19 and April 29, 2003.

## III.

It is clear from the texts of the two interviews, quoted above, that they were *not* the only interviews with complainant conducted by the police and that at least one additional interview *must* have occurred between the two transcribed. This is apparent, because complainant never mentioned the January or the April incidents in the July 24 interview, and yet in the July 31 interview, Investigator Michael is aware of those incidents and those specific dates before the interview begins, e.g. "[Y]ou also told me of a date . . . April 29th." Moreover, Investigator Michael makes no attempt to follow up on the only date supplied for a prior rape in the July 24 interview, one that allegedly occurred at the end of the month of May.

In a discovery motion, and a pretrial hearing on the same, on February 11, 2004, counsel for appellant sought the transcripts (and audiotapes) of the two interviews, which the Commonwealth disclosed. The Commonwealth's position was that its summary of those interviews, as contained in its response to the discovery motion, in conjunction with the preliminary hearing, was sufficient disclosure. The trial court agreed.

In a post-trial Brady motion, the trial court reviewed the transcripts of those interviews (and the initial written statement of July 24) and the trial transcript. The trial court concluded that the motion did not establish a Brady violation. The trial court sealed those transcripts. Counsel for appellant has never seen those transcripts and that denial necessarily hampered him at trial and in the preparation of this appeal. Counsel has not yet had the opportunity to fully

address any inconsistencies that those transcripts might contain, or to demonstrate how those transcripts may have been useful to fashion defenses that otherwise might have been available to appellant.

IV.

ANALYSIS

A.

As the majority acknowledges, "A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused." <u>Youngblood v. West Virginia</u>, 126 S. Ct. 2188, 2190 (2006). Evidence that impeaches the credibility of a Commonwealth witness is exculpatory evidence and falls within the <u>Brady</u> rule. <u>United States v. Bagley</u>, 473 U.S. 667, 676-77 (1985). Finally, as the Supreme Court of Virginia stated in <u>Russell v. Commonwealth</u>, 261 Va. 617, 620-21, 544 S.E.2d 311, 313 (2001), "A . . . fundamental consideration is that the credibility of a witness may be impeached by showing that the witness made statements on a prior occasion that are inconsistent with his present testimony."

On January 23, 2004, the Commonwealth responded to a discovery request by filing a document in part titled "Exculpatory Evidence." The document disclosed two inconsistencies: (1) complainant was unsure if an oral sexual assault had occurred and that it had been two months since she had "a relationship" with appellant. (The disclosure did not explain the meaning of "relationship," i.e. was it an intimate one or a business one.) The document states, "This is inconsistent with her testimony at the preliminary hearing on October 10, 2003 and with what she had previously told Investigator Michael"; and (2) complainant "later remembered" she

- 21 -

had visited appellant's mother's house prior to the alleged rape on July 24. These were the only inconsistencies reported.[12]

A supplemental response was mailed on February 12, 2004, again in part titled "Exculpatory Evidence." No further inconsistencies were acknowledged. This supplemental response explained complainant's reasons for not reporting the earlier rapes: because appellant assured complainant he would "leave her alone" and because appellant threatened her. Of importance, however, is that in the supplemental response the Commonwealth stated: "A *second interview* with Investigator Michael was conducted on July 31, 2003 . . . ." (Emphasis added).

At the pretrial hearing on the discovery motion, held on February 11, 2004, the trial court advised the Commonwealth:

> The Court will direct the Commonwealth's attorney to review [the complainant's statements] again prior to trial . . . . Specifically . . . if, in fact, upon subsequent review there are embellishments, additions or supplemental factual statements and assertions that would be exculpatory as opposed to further explanation, why, in the Court's view, those would be subject to disclosure.

After the post-trial *in camera* review of the handwritten statement of July 24, the transcript of the interview later that day, and the transcript of the July 31 interview, the trial court concluded:

> [T]he Commonwealth made two separate disclosures regarding statements of the victim. The first disclosure was---was very specific and it revealed material inconsistencies. The second disclosure was even more detailed. It described in a comprehensive way *exactly what the [complainant] said in her statements to Investigator Michael*, and the Court has compared the disclosures that took place and the statements that were actually provided to the in-camera materials that the Commonwealth has delivered to the

---

[12] The disclosure does include, while not inconsistencies, that complainant said she had been raped "around the end of May," that complainant did not report to her doctor she had been raped on January 19 or April 29, and that an assault and battery charge against appellant had been dismissed because complainant said there was "no contact" between her and appellant.

- 22 -

> Court, and here, in the Court's view, all of the exculpatory evidence and the impeachment material was actually provided to the defense.

(Emphasis added).

Initially, as we point out above, there necessarily was at least one interview of the complainant by Investigator Michael that occurred between those of July 24 and July 31. In its second response, the Commonwealth, as quoted above, stated: "A *second* interview with Investigator Michael was conducted on July 31." That is not correct. The July 31 interview was, at a minimum, a third interview. We do not know the date of the intervening interview(s). We do not know its or their substance, whether it or they were taped, transcribed or only reflected in Investigator Michael's notes or memory. We do know at least one further interview occurred.[13]

The trial court was never made aware of that interview. Thus, the record suggests the trial court was misled in concluding the Commonwealth's discovery responses, and the *in camera* material reviewed, "described in a comprehensive way exactly what the victim said in her statements to Investigator Michael." We do know, as the trial judge found from the documents he did review, that there were "material inconsistencies."

---

[13] In Lemons v. Commonwealth, 18 Va. App. 617, 446 S.E.2d 158 (1994), we wrote: "We have previously emphasized the importance of the prosecutor's ethical duty to 'make [a] timely disclosure' of exculpatory material." Id. at 621, 446 S.E.2d at 160-61 (quoting Humes v. Commonwealth, 12 Va. App. 1140, 1144 n.2, 408 S.E.2d 553, 555 n.2 (1991)). We justified this principle, stating, "The failure to carry out this duty reduces 'the fact finding process . . . to an exercise in brinkmanship.'" Id. (quoting Stotler v. Commonwealth, 2 Va. App. 481, 484, 346 S.E.2d 39, 41 (1986)). Finally, we explained, "The duty springs from a public prosecutor's broader obligation to 'seek justice, not merely convict.'" Id. (quoting Virginia Code of Professional Responsibility EC 8-10 (1983)).

In the instant case, the Commonwealth told the trial court at the February 11, 2004 discovery hearing: "Judge, I know I get myself into trouble all the time because I don't have an open-file policy, but I don't believe I'm required to give the victim's statements unless it is exculpatory . . . ."

- 23 -

The trial court concluded that despite the failure to provide the requested transcripts documenting known material inconsistencies, there was not a "reasonable probability" that their disclosure would have resulted in a different verdict. I disagree and now address that conclusion.

B.

Recently, the Supreme Court of Virginia reversed a trial court, and this Court, where both had concluded that a failure to disclose impeachment evidence "does not rise to a reasonable probability that the result of the proceeding would have been different." Workman v. Commonwealth, 272 Va. 633, 645, 636 S.E.2d 368, 375 (2006). That Court explained:

> Stated differently, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 678 (1985).
>
> *  *  *  *  *  *  *
>
> In Kyles, the Supreme Court of the United States made several holdings concerning the test of materiality. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." Kyles, 514 U.S. at 434. Second, materiality is not a sufficiency of the evidence test. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434-45. Third, a harmless error analysis is unnecessary once materiality has been determined. Id. at 435. Fourth, suppressed evidence must be "considered collectively, not item by item." Id. at 436. Upon consideration of these factors, a reviewing court is charged with the responsibility of determining if the suppression of evidence "undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678.

Id. at 645, 636 S.E.2d at 374-75.

The majority treats this case like a classic sexual assault case pitting the testimony of the victim against that of the accused. In such a context, as the Virginia Supreme Court wrote in Clinebell v. Commonwealth, 235 Va. 319, 324, 368 S.E.2d 263, 265 (1988),[14]

---

[14] The majority relies in part upon three federal cases in support of their position. The dissent finds this reliance misplaced.

In United States v. Grunewald, 987 F.2d 531 (8th Cir. 1993), the defendant was charged with income tax evasion. He sought the investigating IRS agent's original notes; the government produced typewritten summaries. The trial court "had reviewed the notes as well as the typewritten summaries in camera, and [concluded that there was no material difference between the two" and that they were "duplicative." Id. at 535.

In United States v. Van Brady, 726 F.2d 548, 551 (9th Cir. 1984), defendant sought the entire FBI file of an informant because it "may contain exculpatory facts such as whether the government promised [the informant] immunity from future prosecution for his information." The government provided typewritten summaries. The court concluded that the defendant's "showing of materiality and favorable content [wa]s marginal." Id. By contrast, appellant's claim of materiality is not "marginal"; it is established by the trial court's conclusion that the inconsistencies were "material." Moreover, the Van Brady court states, "The government, where doubt exists as to the usefulness of evidence, should resolve such doubts in favor of full disclosure, but its failure to do so must raise a *reasonable possibility* that it materially affected the verdict . . . ." Id. at 552 (citations omitted) (emphasis added). It is that reasonable possibility that appellant asserts.

In United States v. Phillips, 854 F.2d 273 (7th Cir. 1988), the defendant, admitting he and another robbed a bank, claimed he did so while acting as an FBI informant. He sought his entire confidential informant file. The government provided a typewritten summary. Before trial, defendant asked the court to compare the two and, further, to "address five specific questions regarding the contents of the informant file." Id. at 276. The trial court received both and responded to the questions. The appellate court stated:

> On the one hand, we are cognizant of defendant's expanded
> discovery rights under Brady. On the other, we have the
> government's substantial interest in maintaining the secrecy of its
> files, which may contain not only the names of the informants
> themselves, but also information concerning ongoing
> investigations into other matters, government investigation
> techniques, and the like. Thus, when a criminal defendant seeks to
> discover information contained in confidential government files,
> the trial court must balance the competing interests of the
> defendant and the government in deciding whether and in what
> form such discovery will be allowed.

>     \*    \*    \*    \*    \*    \*    \*

> After reviewing Phillips's FBI informant file, we agree
> with the trial judge that the file contains no Brady material other

- 25 -

In sex offense cases, however, the weight of authority recognizes more liberal rules concerning impeachment of complaining witnesses. Accordingly, a majority of jurisdictions that have considered the issue hold that evidence of prior false accusations is admissible to impeach the complaining witness' credibility or as substantive evidence tending to prove that the instant offense did not occur.

At trial, the following exchanges occurred upon cross-examination of complainant:

> Q. But when you first talked to [Investigator] Michael, you said that you had been raped at the end of May. Do you remember telling him that?
>
> A. No, I don't remember.
>
> Q. Do you deny telling him that?
>
> A. No, I said I don't remember.

In <u>McGehee v. Perkins</u>, 188 Va. 116, 125, 49 S.E.2d 304, 309 (1948), the Supreme Court

of Virginia wrote:

> The fact that his present testimony is inconsistent with his prior . . . statement justifies the showing of the inconsistency, provided he is given an opportunity of correcting the present testimony by directing his attention to the time, place and circumstances of the prior utterance. He cannot escape the consequences by saying he does not recall what he said on the prior occasion.

---

than that reflected in the summary. The summary and the trial judge's conscientious response to Phillips's March 6 letter together fairly and accurately reflect the contents of Phillips's informant file.

<u>Id.</u> at 277-78.

In the instant case, we are not dealing with the Commonwealth's "substantial interest in maintaining the secrecy" of its confidential informant's files. And, again, here the trial court found there were "material inconsistencies" in the transcripts it reviewed *in camera*, not that the transcripts contained "no <u>Brady</u> material."

Finally, in each of the above cases, the trial court was provided, *in camera*, with all information the government possessed with respect to a <u>Brady</u> inquiry. We have established, we feel, that was not done in this case.

See also Currie v. Commonwealth, 30 Va. App. 58, 71-73, 515 S.E.2d 335, 342 (1999); Smith v.

Commonwealth, 15 Va. App. 507, 511, 425 S.E.2d 95, 98 (1992).

Counsel for appellant simply could not impeach complainant about a *fourth* claim of

being raped by appellant, without the transcript denied him by the Commonwealth.  Moreover,

absent the transcripts, counsel for appellant could not forcefully demonstrate and document to

the jury, by using those transcripts, those inconsistencies admitted by the Commonwealth and

later deemed "material" by the trial court.  By analogy, if the Commonwealth possessed an

exculpatory photograph, does it suffice for the Commonwealth to disclose only a description of

what that photograph shows?  Should not that photograph be produced, so a defendant may show

it to a jury.[15]

---

[15] Code § 19.2-268.1 states in relevant part that:  "A witness in a criminal case may be cross-examined as to previous statements made by him [and] reduced into writing . . . ."  This dissent does not seek to reverse or limit our decision in Newton v. Commonwealth, 29 Va. App. 433, 442, 512 S.E.2d 846, 850 (1999), where we held that Code § 19.2-268.1

> was not intended to supplement the discovery provisions of Rule
> 3A:11.  Rather, it was intended to be used as an evidentiary rule by
> the trial court to order the production, inspection and use of a
> written statement once a witness has been cross-examined about
> the existence or contents of a prior statement.

In Newton we reversed the trial court for ordering the production by the defendant during voir dire of the jury of a transcript of a witness interview.  We rejected the Commonwealth's argument that "the trial court properly exercised its authority under Code § 19.2-268.1 in requiring production of the written materials at an earlier time."  Id. at 444, 512 S.E.2d at 851. In so doing, we noted that "the trial judge recognized that the statement was useful for impeachment purposes *only if* the witness provided inconsistent testimony on direct examination."  Id. at 445, 512 S.E.2d at 851 (emphasis added).  We further quoted the trial court as stating:  "*I don't know what this particular witness is going to testify to . . . .*"  Id. at 446 n.3, 512 S.E.2d at 852 n.3 (emphasis in original).
By contrast, in the instant case, the trial court knew, before trial, that there were exculpatory inconsistent statements in the transcripts because the Commonwealth admitted the same at the February 11, 2004 discovery hearing and provided in its discovery responses some of those inconsistencies.
In Scott v. Commonwealth, 7 Va. App. 252, 258, 372 S.E.2d 771, 775 (1988), cert. denied, 490 U.S. 1095 (1989), we held that counsel is not permitted, when questioning the witness, to "paraphrase the questions and answers" in a transcript.  Rather, the transcript itself

V.

This dissent has summarized in detail the evidence presented by the Commonwealth, resulting in appellant's conviction for the July 24, 2003 rape and related charges. The first case quoted in this dissent was Agurs, 427 U.S. at 113. Returning to that quotation, we have summarized the evidence, first because we believe the trial court's verdict "is already of questionable validity"; and, secondly, because we conclude the failure to provide appellant the transcripts (or any information concerning the intervening interviews of complainant) is "additional evidence [that] might be sufficient to create a reasonable doubt." Id. A "reasonable probability," under the standard of Brady, is a probability sufficient to undermine confidence in the outcome of the trial. I lack such confidence.

"It is the province of the jury to pass upon such inconsistent statements and give or withhold their assent to the truthfulness of the particular statement." Shelton v. Mullins, 207 Va. 17, 22, 147 S.E.2d 754, 757-58 (1966).[16] As Judge Benton wrote in his concurrence and dissent in Lemons v. Commonwealth, 14 Va. App. 1009, 1011 n.1, 420 S.E.2d 525, 527 n.1 (1992):

---

shall be shown to the witness. Id. See also Patterson v. Commonwealth, 222 Va. 612, 617, 283 S.E.2d 190, 193 (1981) ("We can perceive no logical reason for requiring counsel to paraphrase a question propounded in a prior proceeding when the question can be more accurately called to the witness' attention by reading from a transcript of the proceeding."); Edwards v. Commonwealth, 19 Va. App. 568, 571-72, 454 S.E.2d 1, 3 (1995) ("[U]sing a transcript, if available, is the preferable means of laying an impeachment foundation . . . . If a transcript is available, the court may require its production pursuant to the mandate of Code § 19.2-268.1 even if there are other means of impeachment.").

In the instant case, where the trial court knew before trial that the interview transcript contained exculpatory inconsistent statements, we believe that knowledge renders the transcript discoverable. Accordingly, while the above cited decisions addressing Code § 19.2-268.1 are instructive with respect to the preference of using an available transcript for impeachment, we do not believe our position in this case limits the application of this Court's earlier decisions concerning that statute.

[16] We recognize that "When a trial judge, sitting as 'both trier of fact and arbiter of law,' finds the Brady evidence inconsequential, there can be 'no logical possibility' that its earlier disclosure 'would have altered the outcome of the case.'" Deville v. Commonwealth, 47 Va. App. 754, 757, 627 S.E.2d 530, 532 (2006) (quoting Stroik v. State, 671 A.2d 1335, 1340

- 28 -

Where "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence," evidence relevant to truthfulness, reliability, and credibility is as constitutionally material as evidence which goes directly to the question of guilt. Fitzgerald v. Bass, 4 Va. App. 371, 385, 358 S.E.2d 576, 584 (1987) (quoting Dozier v. Commonwealth, 219 Va. 1113, 1118, 253 S.E.2d 655, 658 (1979), aff'd en banc, 6 Va. App. 38, 366 S.E.2d 615 (1988), cert. denied sub nom. Fitzgerald v. Thompson, 493 U.S. 945 (1989)). "It is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Napue v. Illinois, 360 U.S. 264, 269 (1959). The information the Commonwealth failed to disclose was exculpatory and should have been disclosed.

In 1864, the Supreme Court of Virginia (then the Supreme Court of Appeals) wrote, in reversing a conviction:

> I think therefore that it was competent for the accused, after asking the witness . . . upon his cross-examination . . . whether he had not said in his testimony before . . . and if he denied having made such a statement, or said that he did not remember making it, to introduce evidence to prove that he did make such a statement, to discredit the witness by impeaching his veracity or showing a defective memory.

Forde v. Commonwealth, 57 Va. (16 Gratt.) 547, 558-59 (1864).

That Court explained, "If the party were precluded by such reply from showing that he made such contradictory statements, the jury would be left in doubt whether they ever were made." Id. at 558.

For the foregoing reasons I would reverse the convictions and remand for retrial, if the Commonwealth be so advised.

---

(Del. 1996)). That conclusion, however, and the deference it properly recites, should not be afforded to a trial judge hearing a *post jury* trial Brady motion.

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **30th** *day of* **May, 2006**.

Howard Z. Garnett, Jr.,                                                                                                Appellant,

 against                         Record No. 3027-04-2
                                Circuit Court Nos. CR4032 through CR4035

Commonwealth of Virginia,                                                                                        Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Felton, Judges Benton, Elder, Frank, Humphreys,
Clements, Kelsey, McClanahan, Haley, Petty and Beales

On April 25, 2006 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on April 11, 2006, and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered herein on April 11, 2006 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

Notwithstanding the provisions of Rule 5A:35, the following briefing schedule hereby is established: Appellant shall file an opening brief upon rehearing *en banc* within 21 days of the date of entry of this order; appellee shall file an appellee's brief upon rehearing *en banc* within 14 days of the date on which the opening brief is filed; and appellant may file a reply brief upon rehearing *en banc* within 14 days of the date on which the appellee's brief is filed. The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter. It is further ordered that the appellee shall file twelve additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

Present:    Judge McClanahan, Senior Judge Willis and Retired Judge Fitzpatrick[*]
Argued at Richmond, Virginia


HOWARD Z. GARNETT, JR.

                                                MEMORANDUM OPINION[**] BY
v.        Record No. 3027-04-2                  JUDGE JERE M.H. WILLIS, JR.
                                                APRIL 11, 2006

COMMONWEALTH OF VIRGINIA,


FROM THE CIRCUIT COURT OF MADISON COUNTY
Daniel R. Bouton, Judge

W. Todd Watson (Hargett &Watson, PLC, on brief), for appellant.

Alice T. Armstrong, Assistant Attorney General (Judith Williams
Jagdmann, Attorney General, on brief), for appellee.


On appeal from his convictions in a jury trial of rape, abduction with intent to defile,

assault and battery on a household or family member, and animate object penetration, Howard

Z. Garnett contends that the trial court erroneously denied his motion for a new trial based on the

Commonwealth's failure to disclose statements given by the victim to the police, which he

claims were exculpatory and could have been used to impeach the victim's credibility at trial.

We agree, reverse the convictions and remand for a new trial.

Background

Garnett and the victim had been involved in a romantic relationship which, according to

varying accounts, had ended some time prior to July 24, 2003.  However, they had continued

doing business.  On the morning of July 24, 2003, the victim went to Garnett's farm to collect

---

[*] Judge Fitzpatrick participated in the hearing and decision of this case prior to the
effective date of her retirement on March 31, 2006.

[**] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

her belongings. She testified that he forcibly took her car keys from her. She followed him into his barn office to retrieve them. She testified that he prevented her leaving the office by physically blocking her exit. She testified that he pushed her up the stairs to a more secluded area of the barn where he verbally and physically attacked her, ultimately raping her.

The victim went to police the day of the attack. She gave the police two statements, the first in handwriting, the second was recorded and transcribed. On July 31, 2003, she gave the police a third statement, which was also recorded and transcribed.

Prior to trial, the Commonwealth responded to Garnett's request for exculpatory information by paraphrasing information from the victim's statements. Garnett requested the statements, recordings, and transcripts themselves. The trial court denied this request. Although the Commonwealth provided further summaries of information from the statements that it deemed exculpatory, Garnett was not allowed access to the statements themselves.

Following trial, Garnett moved to set aside the verdicts on the ground that the Commonwealth had failed to provide the victim's statements which were exculpatory and would have enabled him to impeach her testimony.[1] The trial court conducted an *in camera* review of the statements. It found that the statements revealed "material inconsistencies" in the victim's testimony, but held that the Commonwealth had sufficiently disclosed the exculpatory material through its summaries. It further held that, even if the statements contained exculpatory evidence not encompassed by the Commonwealth's summaries, the withheld information was not "material" and, therefore, the Commonwealth's failure to disclose it did not warrant a new trial.

---

[1] Appellant argued the statements would reveal inconsistencies in the victim's accounts as they related to the timing and nature of her "relationship" with appellant and the duration of her alleged detention in appellant's barn.

The Commonwealth's summaries were an insufficient disclosure. The trial court's refusal to require production of the statements themselves denied Garnett his rights under Brady v. Maryland, 373 U.S. 83 (1963).

Analysis

"We review [Garnett's claim] under settled constitutional principles concerning the disclosure of exculpatory evidence." Lovitt v. Commonwealth, 266 Va. 216, 244, 585 S.E.2d 801, 817 (2003).

> In Brady . . . the Supreme Court held that a due process violation occurs when the prosecution suppresses evidence favorable to an accused that is material either to guilt or to punishment, irrespective whether the prosecution acted in good faith or bad faith.
>
> Exculpatory evidence is material if there is a reasonable probability that the proceeding would have resulted in a different outcome had the evidence been disclosed to the defense. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome of the proceeding. At the heart of this inquiry is a determination whether the evidence favorable to the defendant could reasonably be considered as placing the entire case in such a different light that confidence in the verdict is undermined.
>
> The Brady disclosure requirements extend to information that can be used to impeach a witness' credibility. A prosecutor's suppression of impeachment evidence creates a due process violation only if the suppression deprives the defendant of a fair trial under the Brady standard of materiality.

Id. at 244-45, 585 S.E.2d at 817-18 (citations omitted).

"We agree that disclosure of the statement[s] before trial would have aided [Garnett's] attorney in his preparation. Furthermore, the absence of such aid lessens our confidence in the outcome of the case." Lemons v. Commonwealth, 18 Va. App. 617, 620, 446 S.E.2d 158, 160 (1994). As we stated in Lemons,

> [w]e can find no reason for the prosecution's refusal to disclose the statement to the defense. The statement does not contain any

information regarding any other criminal prosecution, any private information concerning any person, or any reason to protect the identity of any person mentioned in it. . . .[2]

We have previously emphasized the importance of the prosecutor's ethical duty to "make [a] timely disclosure" of exculpatory material. The failure to carry out this duty reduces "the fact finding process . . . to an exercise in brinkmanship." The duty springs from a public prosecutor's broader obligation to "seek justice, not merely to convict." Virginia Code of Professional Responsibility EC 8-10 (1983).

A prosecutor does not meet his or her ethical and constitutional duty simply by making a pretrial determination that the information, if disclosed, would not likely change the outcome of the trial. A prosecutor is unable to determine the ultimate "materiality" of evidence in a trial which has not yet occurred. If in doubt about the exculpatory nature of the material, a prosecutor should submit it to the trial court for an *in camera* review to determine if it is exculpatory and should be disclosed.

Id. at 620-21, 446 S.E.2d at 160-61 (some citations omitted) (footnote added).

The Commonwealth and the trial court agreed that the victim's statements contained exculpatory information. Indeed, the Commonwealth disclosed some information from the statements in discovery, but refused to disclose the statements themselves. While it is proper for the trial court to review questioned material to determine whether it is exculpatory, a finding that the material is, in fact, exculpatory, requires the disclosure of the actual evidence to defense counsel. The accused is entitled to have his counsel review and utilize exculpatory material itself. Should the material contain information to which a defendant is not entitled, that information may be redacted, an issue not raised in this case.

To support a claim under Brady, Garnett must demonstrate not merely that the suppressed evidence was exculpatory; but that it was "material" to his conviction. He must show a "reasonable probability that the proceeding would have resulted in a different outcome had the

---

[2] The Commonwealth has suggested no need for redaction of any part of the statements.

evidence been disclosed to the defense." Lovitt, 266 Va. at 244, 585 S.E.2d at 817. He has met this burden.

The disparities between the victim's statements and her trial testimony significantly challenged her credibility. Because her testimony was essential to prove the charges against Garnett,[3] any information that significantly cast doubt on her credibility provided a reasonable probability that the proceeding would have resulted in a different outcome and, therefore, was material.

We reverse appellant's convictions and remand this matter for a new trial if the Commonwealth be so advised.

Reversed and remanded.

---

[3] The victim's credibility was material to all charges, including the rape conviction. While there was evidence of bruises and scratches, no evidence of semen was recovered, and prosecution and defense expert witnesses disagreed as to whether photographs of the victim's vaginal area showed any injury.

McClanahan, J., dissenting.

Pursuant to the defendant's post-trial motion, the trial court conducted an *in camera* review of the victim's statements. It held that the Commonwealth's disclosures were sufficient under Brady v. Maryland, 373 U.S. 83 (1963),[4] but if a Brady violation did occur, such violation failed to meet the standard for justifying a new trial. While I agree with the majority's opinion that the statements in question were exculpatory, that fact alone does not end our inquiry on appeal and I, therefore, dissent.

The dispositive issue is whether the trial court erred in determining that disclosure of the exculpatory evidence would not have affected the verdict.[5] Deville v. Commonwealth, __ Va. App. __, __, __ S.E.2d __, __ (March 28, 2006). A defendant "must show that a reasonable probability exists that the statement's disclosure would have resulted in a different outcome."

---

[4] In addressing the Commonwealth's disclosures, the trial court stated:

> The first disclosure was --- was very specific and it revealed material inconsistencies. The second disclosure was even more detailed. It described in a comprehensive way exactly what the victim said in her statements to [the] Investigator [], and the Court has compared the disclosures that took place and the statements that were actually provided to the in-camera materials that the Commonwealth has delivered to the Court, and here, in the Court's view, all of the exculpatory evidence and the impeachment materials was actually provided to the defense. The Commonwealth even points out in one of its disclosures, very clearly, what the inconsistencies actually consist of. There's something of a road map to impeachment, so, in the Court's view, the disclosure was sufficient when one compares what was disclosed to the in-camera material.

[5] In White v. Commonwealth, 12 Va. App. 99, 402 S.E.2d 692, aff'd en banc, 13 Va. App. 284, 410 S.E.2d 412 (1991), the Commonwealth's disclosure was sufficient to determine that a confederate's confession was at least partially exculpatory, but this Court could not say "without qualification whether it was material or not. The materiality of the confederate's confession can only be determined from an evaluation of the entire document in light of all the circumstances." Id. at 105, 402 S.E.2d at 696. This Court vacated the defendant's conviction and remanded the case to the trial court for a determination of the confession's materiality. In that case, there was no materiality determination for us to review and the confession was not a part of the record.

Lemons v. Commonwealth, 18 Va. App. 617, 620, 446 S.E.2d 158, 160 (1994); see also Waters v. Commonwealth, 43 Va. App. 636, 648, 600 S.E.2d 918, 924 (2004). "'The mere possibility that an item of undisclosed information might have helped the defense . . . does not establish "materiality" in the constitutional sense.'" Frontanilla v. Commonwealth, 38 Va. App. 220, 227, 562 S.E.2d 706, 709 (2002) (quoting United States v. Agurs, 427 U.S. 97, 109-10 (1976)); see also Hughes v. Commonwealth, 18 Va. App. 510, 526, 446 S.E.2d 451, 461 (1994).

In this case, the defendant attempted to obtain copies of the victim's verbatim statements before, during, and after trial. She was a material prosecution witness. While the Commonwealth provided a summary of the exculpatory evidence, it never provided the verbatim statements. Post-trial, the court reviewed the statements *in camera* and determined that there was no reversible Brady violation. Bowman v. Commonwealth, 248 Va. 130, 135, 445 S.E.2d 110, 113 (1994) (whether a trial court "should undertake the review of the disputed material is a discretionary matter"); Cherricks v. Commonwealth, 11 Va. App. 96, 102, 396 S.E.2d 397, 400 (1990).

In Wilson v. Commonwealth, 25 Va. App. 263, 487 S.E.2d 857 (1997), this Court reviewed the trial court's determination that the undisclosed pretrial statements of several witnesses were not material. The trial court held that the "the record did not support a finding that a reasonable probability existed that a different outcome would have resulted" had the statements been disclosed. Id. at 273-74, 487 S.E.2d at 862. Finding no error, we affirmed.

The defendant cites seven examples of inconsistent, omitted or contradicted testimony relevant to the trial court's alleged error in finding that disclosure would not have affected the verdict – all relating to the issue of impeachment. This alleged error is akin to the error argued in Fitzgerald v. Bass, 6 Va. App. 38, 366 S.E.2d 615 (1988) (*en banc*). In Fitzgerald, the defendant's cellmate, who testified the defendant confessed to the crime, testified falsely about

his own criminal record but admitted he was a felon.  The trial court reviewed his background and determined that while the jury was not aware of the cellmate's complete record, it knew, and the defense highlighted, that he had an extensive criminal background.  As such, it held that "given the extent to which [the witness'] credibility was impeached, it is doubtful that additional evidence in this regard would have made a difference in the jury's opinion of his credibility."  Id. at 55, 366 S.E.2d at 624-25.  Finding no error, we affirmed.

In the instant case, the trial court noted the summary disclosures were "very specific and . . . revealed material inconsistencies."  The trial court concluded, and the Commonwealth conceded, that the statements were exculpatory; however, the trial court held that disclosure would not have affected the verdict.  Deville, __ Va. App. at __, __ S.E.2d at __ (defendant's Brady claim fails absent a showing of prejudice).  The sealed exculpatory statements, the disclosed summaries, and the victim's testimony at trial, including the defendant's extensive cross-examination, dictate that "[u]nder the totality of the circumstances, there is not a 'reasonable probability of a different result' had the materials been disclosed."  Currie v. Commonwealth, 30 Va. App. 58, 68, 515 S.E.2d 335, 340 (1999).  Accordingly, I would affirm.