**Salem**

WARREN EDWARD LEMONS, JR.

v.

COMMONWEALTH OF VIRGINIA

No. 2488-92-3

Decided July 5, 1994

618

COUNSEL

Wayne D. Inge, for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

OPINION

**BARROW, J.**—In this appeal, we examine the futile and costly result of a prosecutor's refusal to disclose an exculpatory statement to a criminal defendant. Being unable to conclude, to a reasonable degree of probability, that had the exculpatory statement "been disclosed to the defense, the result of the proceeding would have been different," we must affirm. *United States v. Bagley*, 473 U.S. 667, 682 (1985). This conclusion, however, follows five separate judicial reviews of the prosecutor's refusal to disclose the statement, a refusal which persisted even after the prosecutor implicitly recognized that the statement was exculpatory.

The defendant was convicted of murder and malicious wounding. A jury found that he shot and killed one victim and shot and wounded another. The defendant initially confessed to the shootings, but the next day, recanted, explaining that he had been "covering for" another person.

Before trial, the defendant sought to discover any exculpatory materials possessed by the prosecution. The prosecution initially responded that she was unaware of any; however, she later discovered and revealed that she had a statement of a witness who had said that someone other than the defendant had shot the victims.

The prosecution summarized the exculpatory portions of the witness's statement but refused to give the statement to defense counsel. The trial court did not require the prosecution to produce the statement, did not review the statement *in camera*, and did not make it a part of the record.

On appeal, a panel of this Court held that the statement was exculpatory. *Lemons v. Commonwealth*, 13 Va. App. 668, 673, 414 S.E.2d 842, 845 (1992). After a rehearing *en banc*, we vacated the convictions and remanded the case to the trial court. *See Lemons v. Commonwealth*, 14 Va. App. 1009, 1009, 420 S.E.2d 525, 526 (1992). We directed the trial court to require production of the statement and to review it *in camera* to determine if it was material. *Id.* The trial court inspected the statement and concluded that the statement was not material. This determination is now before us on appeal.

Before trial, although the prosecution did not disclose the witness's statement to the defendant, it did reveal that the eyewitness had told an officer that "two black males known as 'Munch' and 'Chipper' — not Warren Lemons — fired the shots that killed Bobby Watson and wounded David Farmer." When the witness testified at trial, he denied identifying the shooter by name, giving only a physical description. However, during cross-examination, the prosecution elicited from him that he remembered telling a policeman "[s]omething like" he "saw Chipper pull the trigger three times," and "then either Muncher or a third person . . . grabbed the gun, shot a guy, he fell to the ground and finished unloading the shells in him."

The undisclosed statement recited essentially that which the prosecution elicited from the witness on cross-examination but in more detail.[1] No new information concerning how the homicide occurred appeared in the witness's statement. Although in his pretrial statement, the witness identified someone other than the defendant as the assailant, he also explained that someone else had told him the assailant's name. At trial, he explained that he gave the statement while "confused, dazed, and very upset."

The defendant contends that, had this statement been given to his attorney before trial, it would have assisted in his trial prepa-

---

[1] *See* Appendix 1.

ration and would have assisted in developing his theory of the case. Primarily, he suggests that he would have used the statement to confront the witness before trial and attempt to determine why he was deviating from his statement.

■ We agree that disclosure of the statement before trial would have aided the defendant's attorney in his preparation. Furthermore, the absence of such aid lessens our confidence in the outcome of the case. However, the defendant must show more. The defendant must show that a reasonable probability exists that the statement's disclosure would have resulted in a different outcome. *See Bagley*, 473 U.S. at 682; *Bowman v. Commonwealth*, 248 Va. 130, 133, 445 S.E.2d 110, 112 (1994). A review of all of the evidence presented at trial reveals that the defendant has not met his burden.

Several Commonwealth witnesses testified that the defendant was the shooter. The wounded victim testified that he saw the defendant shoot the decedent in the chest and then shoot the witness, himself, repeatedly as he lay on the ground. Another prosecution witness testified that he saw the defendant operate the slide on his semi-automatic pistol and fire the gun eight times at two white men twenty feet away.

A defense witness claimed to have seen the shooting and gave a physical description of the shooter, whom he did not recognize and whose face he did not see. He was acquainted with the defendant, "Munch" Dungee, and "Chipper" Gunn. He testified that Gunn had earlier threatened to kill a bouncer and had displayed a nine millimeter semi-automatic pistol. Another defense witness, who also knew the defendant, testified that he had seen the shooting, but could not identify the shooter. At trial, his physical description of the shooter was impeached by a police officer who testified that the witness had given a different description on the night of the shooting. In light of all of the evidence presented, we cannot find to a reasonable degree of probability that the disclosure of the verbatim statement would have produced a different outcome.

We can find no reason for the prosecution's refusal to disclose the statement to the defense. The statement does not contain any information regarding any other criminal prosecution, any private information concerning any person, or any reason to protect the identity of any person mentioned in it. The witness's identity was

revealed to the defendant's attorney before trial.

■ We have previously emphasized the importance of the prosecutor's ethical duty to "make [a] timely disclosure" of exculpatory material. *Humes v. Commonwealth*, 12 Va. App. 1140, 1144 n.2, 408 S.E.2d 553, 555 n.2 (1991) (citing DR 8-102(A)(4)); *Stotler v. Commonwealth*, 2 Va. App. 481, 484, 346 S.E.2d 39, 41 (1986). The failure to carry out this duty reduces "the fact finding process . . . to an exercise in brinksmanship." *Stotler*, 2 Va. App. at 484, 346 S.E.2d at 41. The duty springs from a public prosecutor's broader obligation to "seek justice, not merely to convict." *Virginia Code of Professional Responsibility* EC 8-10 (1983).

■ A prosecutor does not meet his or her ethical and constitutional duty simply by making a pretrial determination that the information, if disclosed, would not likely change the outcome of the trial. *Humes*, 12 Va. App. at 1144 n.2, 408 S.E.2d at 555 n.2. A prosecutor is unable to determine the ultimate "materiality" of evidence in a trial which has not yet occurred. *See id.* (noting that it would be unacceptable if the prosecutor's duty to disclose lessened as his case grew stronger). If in doubt about the exculpatory nature of the material, a prosecutor should submit it to the trial court for an *in camera* review to determine if it is exculpatory and should be disclosed. *See Lemons v. Commonwealth*, 13 Va. App. 668, 671, 414 S.E.2d 842, 844 (1992).

■ If a prosecutor violates a discovery order, a trial court has the authority to levy sanctions. *Conway v. Commonwealth*, 11 Va. App. 103, 113, 397 S.E.2d 263, 269-70 (1990); *Stotler*, 2 Va. App. at 484, 346 S.E.2d at 41. As suggested by our previous opinions, a trial court should consider imposing significant sanctions, which deter unreasonable refusal to comply with discovery requirements more effectively than does the prospect of a defendant's appeal. *See id.*

Despite the prosecutor's early recognition that the witness's statement was exculpatory, her ethical obligation to disclose it, and the threat of sanctions if she did not, her refusal to do so persisted through five separate judicial reviews, two in the trial court and three in this Court. Had the prosecutor disclosed the contents of the statement when she recognized that it was exculpatory, she would have conserved the resources of the criminal

justice system and, more importantly, assured that the defendant's conviction was achieved through the pursuit of justice, not an unbridled desire to convict.

However, being unable to conclude to a reasonable degree of probability that the disclosure of the statement would have affected the outcome of the case, we can do no more than affirm the judgment of the trial court.

*Affirmed.*

Coleman, J., and Koontz, J., concurred.

## APPENDIX 1

In part, the written transcript of the witness's statement to the police, which an attorney for the defendant saw for the first time immediately preceding oral argument in this Court, contained the following:

A. . . . And I saw Chipper lean over into the car, say something then turn around and was pointing so we all thought, well, there is going to be a fist fight. And the next thing we know, we heard gunshots go off.

* * * * * * *

18Q. Did you actually see anyone shooting a gun?

A. Yes I saw Chipper pull the trigger three times and turn around and it looked like he threw the gun into the car and then either Muncher or a third person that was standing out of the car grabbed the gun, shot a guy, he fell to the ground, and finished unloading the shells in him and then they got in the car and they drove off.

19Q. So the guys you saw shooting was [sic] Chipper and Muncher?

A. It looked like Muncher and it could have been the first guy. They were all three standing outside the car.

20Q. Alright, could you see, which person did you see shooting first?

A. Chipper.

21Q. And how many times did Chipper shoot?

A. Three.

22Q. Did anybody fall when he shot?

A. When I saw him shoot the first time, I saw a guy running from where they were standing toward Rotten Rodney's with his arm down on the side like he was shot in the shoulder and then I saw him drop and then that's when we heard the rest

of the shots go off.

23Q. But you're sure the guy that you saw shooting first is not the guy that was shooting the other shot?

* * * * * * *

A. I'm sure.

* * * * * * *

28Q. Have you heard who did the shooting since you got down here or while the police were arriving out there?

A. Just from what I saw and who I recognized that was it.

29Q. Just Chipper, you know Chipper did. What about the other guy that was shooting, do you know if that was Mucher [sic] or not?

A. I couldn't see cause after I heard that first set of shots go off, everybody was panicking and people running in a door and I was pressed down in a squatted position holding the door open for people to come in.

30Q. Would you recognize, do you know Chipper when you see him?

A. I probably could see him again if he had on the same clothes, I'd recognize him. . . .

31Q. How do you know it was . . .

A. Through Mike Parnell [another eyewitness].

32Q. Is he the one that told you the guy's nickname was Chipper?

A. Yeah. He's the one that told me what his nickname was.

33Q. When did he tell you that?

A. We were, uh, he had pointed to - he had pointed them out to me and said to watch his back that they may jump him

when the club closes but they didn't jump him they jumped two other white guys and, uh, he told me who they were that ones [sic] nickname is Chipper and the other was Muncher but he didn't know who the third one was.

\* \* \* \* \* \* \*

35Q. If you saw a picture of the person that you saw shooting, would you be able to recognize him?

A. Um-huh.