*537 HALEY, J., with whom BENTON and ELDER, JJ., join, dissenting.
We respectfully dissent.
I.
This dissent shall examine the facts in the continuum of the relationship between appellant and complainant, because:
The proper standard of materiality [in Brady evaluation] must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
United States v. Agurs, 427 U.S. 97, 112-13, 96 S.Ct. at 2401-02, 49 L.Ed.2d 342 (1976) (emphasis added), cited with approval in Dozier v. Commonwealth, 219 Va. 1113, 1116-17, 253 S.E.2d 655, 657 (1979).
In Lovitt v. Warden, 266 Va. 216, 585 S.E.2d 801 (2003), the Supreme Court of Virginia recognized the foregoing italicized considerations. There, the Court stated that a Brady “due process analysis requires consideration on an item-by-item basis whether the evidence at issue was exculpatory. However, the determination whether undisclosed exculpatory evidence was material must be made by considering its cumulative effect.” Id. at 245, 585 S.E.2d at 818 (emphasis added).
II.

FACTS

With that standard, a detailed summary of relevant facts in the entire record is necessary. It should be remembered that *538 appellant was indicted and tried on three charges of rape, one on July 24, 2003, one on January 19, 2003, and one on April 29, 2003.
A.

The July 2Jp, 2003 Incident

Complainant is a 53-year-old registered nurse “in labor and delivery, nursery and postpartum” at Fauquier Hospital. Complainant moved from Delaware[8] to Madison County, Virginia, in 2001. That year she purchased a tract of land from, and adjoining property owned by, appellant and appellant’s mother. She wished to build a home on the property and develop a portion of it for resale. In May 2001, complainant began an “intimate relationship” with appellant and moved into his residence.
In July 2001, complainant filed a complaint under oath, charging appellant with assault and battery. That charge was dismissed, because as the Commonwealth’s Attorney wrote, complainant was “non-cooperative, stating that she grabbed him first, and that there was no violent contact between her and the defendant at that time.” In short, complainant told the Commonwealth Attorney she had lied while under oath when filing the complaint for the arrest warrant.
Complainant continued to live with appellant until August 2002, when her home was completed. After she moved into her home, part of which appellant had constructed on the land she purchased from him, they were “neighbors.” Appellant continued living with his mother 200 to 300 yards from complainant. Appellant and complainant continued their consensual sexual relationship until November 2002.
According to complainant, on July 24, 2003, she drove her truck to the barn, which was located between appellant’s home and complainant’s home, to pick up “personal belongings” she *539 had stored there. These included garden hoops, a tiller, stall mats, tools, building supplies, and parts of a dismantled greenhouse. When she arrived at 8:30 a.m., appellant was present and a VDOT paving crew was working on the road in front of the barn. Appellant, by “squeezing her hand” and “bending her hand” back for thirty seconds, took her truck keys, and, despite her requests, refused to return them. After taking her truck keys, complainant claims appellant “started to walk on towards his house ... and [she] followed him all the way to his house.”
She followed appellant into the house in which “he gathered a couple of mugs and gave them to me. They were my property.” During this time in the house complainant knew appellant’s mother was present, but made no complaint to his mother about appellant taking her keys from her by force and refusing to return them. Complainant testified they spent “less than five minutes” in the house. Then, “He walked out the door and I followed him” back to the barn. She was not “physically restrained” going to the house or back to the bam.
At the barn, appellant made “advances” towards her, but she nonetheless entered the barn to get her property. In the barn, complainant claimed appellant “pushed me up the stairs and then we went to the back of the barn,” where appellant allegedly raped her.[9] He pushed her “forward over a [waist-high] wall and pulled [her] shorts down.” When asked if appellant ejaculated she answered: “I don’t know. I don’t think so.” She testified that she either did not know, or could not remember, if appellant orally sexually assaulted her. She said the rape occurred “around noon,” that is, 2/£ hours after she initially arrived at the barn. She claimed appellant threatened her life and appellant was “yelling and screaming.” Also, she testified, “I was screaming and yelling the whole time it was going on ... and hoping the people out[side] who were working in the front would hear.”
*540 On direct examination the following exchange occurred, referring to the time of the assault and immediately thereafter:
Q. Was there anybody else around the barn at that time?
A. There was a VDOT work crew working on the road in front of the barn.
Q. Why didn’t you run out to the paving crew? Were they still outside the barn?
A. I don’t know----By that time I had no idea.
After the attack, complainant testified that she and appellant “were in and out of the barn” bringing out her stall mats. Appellant “brought my truck around and loaded my stall mats into it.” He then drove complainant to her home in her truck and “left her keys” in that truck. Complainant entered her home, did not call 911, “got a drink of water and I went to the police station.” She stayed in her home “maybe five minutes.”
Complainant’s testimony revealed that since Thanksgiving 2002, appellant had aided her in various business enterprises. He had advised her on the purchase of plants, tilled the ground and bedded plants on her property-plants complainant wished to sell. Complainant may have also purchased garden supplies associated with the venture in the name of “Garnett’s Gardens.” Complainant purchased a dismantled greenhouse and she and appellant transported the components, to be re-erected near the barn. In March, April and May 2003, complainant also had a used furniture business located in a booth at The Emporium,[10] and appellant hauled furniture to and from the same. Appellant’s mother lived with complainant in her home for approximately a week in January 2003, following a debilitating injury. In the spring of 2003, complainant sought to subdivide her property and sought appellant’s advice with respect to the same, including lay-out, septic fields, and other information.
*541 In addition to the foregoing business and semi-business relationship with appellant, documentary evidence showed that on June 23, 2003, complainant entered into a contract to purchase the home of appellant and his mother for $135,000. That contract was terminated by a release between the parties. Complainant signed the release on July 16, 2003, appellant signed on July 24, (the day of the incident), and appellant’s mother signed on July 25.
Further, in February 2004, more than six months after the July 24 incident, complainant sought to obtain 1.87 acres from appellant and his mother, apparently in connection with complainant’s desire to subdivide her property, by a boundary line adjustment deed. She retained counsel who prepared a deed to that effect and forwarded it on February 9, 2004, with a request it be signed. That agreement was not consummated, apparently because of litigation concerning a deed of trust on that property.
In summary, complainant testified that on July 24, 2003, she went to the barn at 8:30 a.m., had her keys then taken as a result of 30 seconds of violence, walked up to appellant’s house, stayed there less than 5 minutes, walked back to the barn, and the attack occurred around noon. After the attack, she and appellant reentered the barn and loaded three stall mats in her truck; he drove her home; she got a drink of water, and after staying in her home “maybe five minutes,” went to the police. She saw Deputy Sheriff Shawn Hill.
Deputy Hill testified on direct examination:
Q. Do you know approximately what time it was that you encountered [the complainant]?
A. [The complainant] came into the office at approximately 2:30 to 2:40 that afternoon.
íjí s¡c sjc i}: ^ sfc
Q. What was the complaint that you had from [her]?
A. Okay. Initially, [the complainant] stated that she had been assaulted ... and then further, approximately *542 fifteen (15) to twenty (20) minutes after that, she informed me that she had been sexually assaulted.
When asked on cross-examination to explain the apparent time gap between 8:30 a.m., when she arrived at the barn, and her appearance at the police station, complainant responded that she believed that appellant held her “until two o’clock in the afternoon.”[11]
When she did arrive at the police station, Deputy Hill testified that complainant’s clothing was “dirty” and “in a disarray”; she had “several scratches and bruises”; and “some redness and puffiness to her face.” Upon learning of her claim of sexual assault, Hill took her to the emergency room at the University of Virginia Hospital.
At the hospital, complainant saw Sandra Lee Annan, a sexual assault nurse examiner. She described complainant’s clothes as “sort of dusty, dirty,” and detailed bruises or scratches on her hands and knees. By using a dye procedure to discern abrasions not visible to the eye, she found “two small dots” inside the outer lips of the vagina, which were consistent with sexual intercourse. Such abrasions will remain detectable for up to three days after intercourse. She found no bruises or scratches on her breasts, back, palms of her hands, elbows, forearms, ears, or from her waist down to the front of her knees.
The nurse further obtained: (1) swabs from complainant’s ears, neck, cheeks, buttocks, thighs, and vaginal area; (2) complainant’s clothes; and (3) the results of a comb-through of complainant’s pubic hair. DNA analyses showed: (1) no sperm, seminal fluid or blood was found on the vaginal/cervical areas, thighs/external genitalia, perianal/buttocks, left ear, right ear, cheeks or neck. The DNA profiles from swabs behind the left ear and cheeks and neck were consistent with a mixture of complainant and appellant components; (2) no *543 evidence of blood or seminal fluid was found on complainant’s tank top or shorts; and (3) the results of the pubic hair combing showed no hair except that of complainant.
Investigator Donnie Michael took a written statement from complainant on July 24, 2003, and interviewed her. Investigator Michael again interviewed her on July 31, 2003. Both interviews were audio taped and transcribed. These allegedly were the only two interviews of complainant by the Commonwealth.
On July 28, 2003, appellant voluntarily went to the Sheriffs department, waived his Miranda rights, and gave an interview. A transcript of his statement was introduced in evidence. Appellant denied raping complainant at any time. Appellant stated that, on July 24, 2003, he and complainant discussed the greenhouse, walked up to his mother’s house, had coffee and conversation with her for ten minutes, walked back to the barn, discussed the purchase of a tractor, tried to get a tiller started they used on their joint garden project, and together pulled out of the barn and loaded dirty stall mats into the back of her truck. During this loading, appellant stated, complainant slipped and fell and he picked her up. A transcript of this interview was introduced at trial by the Commonwealth.
The jury found appellant guilty of the July 24, 2003 rape and related crimes.
B.

The Incidents of January 19, 2003 and April 29, 2003

As noted above complainant allegedly gave two transcribed (and audio-taped) statements, one on July 24 and one on July 31, both conducted by Investigator Michael. At the end of the July 24 interview the following exchange occurred:
Q. Has he ever done this to you before?
A Yes
Q. He’s raped you before?
A. Yes
*544 Q. Have you reported it?
A. No
Q. How many times has he raped you?
A. Uhm he’s probably forced himself on me two or three times now.
Q. And do you know when that occurred?
A. Aah well the last time it happened I think it was in the month of end of May.
Q. Of this year?
A. Yeah
In the interview, complainant mentioned no dates of these assaults except “end of May” and specifically did not mention any assaults on January 19 or April 29, 2003.
During the July 31 interview, Investigator Michael asked complainant the following question: “The first one being January 19, 2003 can you tell me what happened and where this happened?” Complainant said that appellant raped her on that date, that she went to the doctor but did not tell him she had been raped, and that she had taken pictures of herself on that date which she provided Investigator Michael. The interview continues: (Q) “0.k. you also told me of a date on April. April 29th.” (A) “April 29th, right.” Complainant told Investigator Michael appellant raped her on that date, but she did not report it to the police or seek medical assistance. She further told Investigator Michael that appellant ejaculated inside her on both January 19 and April 29, 2003.
At trial complainant testified appellant assaulted and raped her in her home on January 19, 2003, and on April 29, 2003. She produced photographs of herself, which she claims she took of herself on January 19, and photographs she (and a friend) took on May 3, 2003, purporting to document the injuries she received from the assaults. Complainant maintained she did not report either of these rapes to the police because appellant threatened to kill her “and bury [her] on the property.”
*545 The jury found appellant not guilty of the alleged rapes on January 19 and April 29, 2003.
III.
It is clear from the texts of the two interviews, quoted above, that they were not the only interviews with complainant conducted by the police and that at least one additional interview must have occurred between the two transcribed. This is apparent, because complainant never mentioned the January or the April incidents in the July 24 interview, and yet in the July 31 interview, Investigator Michael is aware of those incidents and those specific dates before the interview begins, e.g. “[Y]ou also told me of a date ... April 29th.” Moreover, Investigator Michael makes no attempt to follow up on the only date supplied for a prior rape in the July 24 interview, one that allegedly occurred at the end of the month of May.
In a discovery motion, and a pretrial hearing on the same, on February 11, 2004, counsel for appellant sought the transcripts (and audiotapes) of the two interviews, which the Commonwealth disclosed. The Commonwealth’s position was that its summary of those interviews, as contained in its response to the discovery motion, in conjunction with the preliminary hearing, was sufficient disclosure. The trial court agreed.
In a post-trial Brady motion, the trial court reviewed the transcripts of those interviews (and the initial written statement of July 24) and the trial transcript. The trial court concluded that the motion did not establish a Brady violation. The trial court sealed those transcripts. Counsel for appellant has never seen those transcripts and that denial necessarily hampered him at trial and in the preparation of this appeal. Counsel has not yet had the opportunity to fully address any inconsistencies that those transcripts might contain, or to demonstrate how those transcripts may have been useful to fashion defenses that otherwise might have been available to appellant.
*546 IV.

ANALYSIS

A.
As the majority acknowledges, “A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused.” Youngblood v. West Virginia, — U.S.-,.-, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269 (2006). Evidence that impeaches the credibility of a Commonwealth witness is exculpatory evidence and falls within the Brady rule. United States v. Bagley, 473 U.S. 667, 676-77, 105 S.Ct. 3375, 3380-81, 87 L.Ed.2d 481 (1985). Finally, as the Supreme Court of Virginia stated in Russell v. Commonwealth, 261 Va. 617, 620-21, 544 S.E.2d 311, 313 (2001), “A ... fundamental consideration is that the credibility of a witness may be impeached by showing that the witness made statements on a prior occasion that are inconsistent with his present testimony.”
On January 23, 2004, the Commonwealth responded to a discovery request by filing a document in part titled “Exculpatory Evidence.” The document disclosed two inconsistencies: (1) complainant was unsure if an oral sexual assault had occurred and that it had been two months since she had “a relationship” with appellant. (The disclosure did not explain the meaning of “relationship,” i.e. was it an intimate one or a business one.) The document states, “This is inconsistent with her testimony at the preliminary hearing on October 10, 2003 and with what she had previously told Investigator Michael”; and (2) complainant “later remembered” she had visited appellant’s mother’s house prior to the alleged rape on July 24. These were the only inconsistencies reported.[12]
*547 A supplemental response was mailed on February 12, 2004, again in part titled “Exculpatory Evidence.” No further inconsistencies were acknowledged. This supplemental response explained complainant’s reasons for not reporting the earlier rapes: because appellant assured complainant he would “leave her alone” and because appellant threatened her. Of importance, however, is that in the supplemental response the Commonwealth stated: “A second interview with Investigator Michael was conducted on July 31, 2003----” (Emphasis added).
At the pretrial hearing on the discovery motion, held on February 11, 2004, the trial court advised the Commonwealth:
The Court will direct the Commonwealth’s attorney to review [the complainant’s statements] again prior to trial---Specifically ... if, in fact, upon subsequent review there are embellishments, additions or supplemental factual statements and assertions that would be exculpatory as opposed to further explanation, why, in the Court’s view, those would be subject to disclosure.
After the post-trial in camera review of the handwritten statement of July 24, the transcript of the interview later that day, and the transcript of the July 31 interview, the trial court concluded:
[T]he Commonwealth made two separate disclosures regarding statements of the victim. The first disclosure was—was very specific and it revealed material inconsistencies. The second disclosure was even more detailed. It described in a comprehensive way exactly what the [complainant] said in her statements to Investigator Michael, and the Court has compared the disclosures that took place and the statements that were actually provided to the in-camera materials that the Commonwealth has delivered to the Court, and here, in the Court’s view, all of the exculpatory evidence and the impeachment material was actually provided to the defense.
(Emphasis added).
Initially, as we point out above, there necessarily was at least one interview of the complainant by Investigator Michael *548 that occurred between those of July 24 and July 31. In its second response, the Commonwealth, as quoted above, stated: “A second interview with Investigator Michael was conducted on July 31.” That is not correct. The July 31 interview was, at a minimum, a third interview. We do not know the date of the intervening interview(s). We do not know its or their substance, whether it or they were taped, transcribed or only reflected in Investigator Michael’s notes or memory. We do know at least one further interview occurred.[13]
The trial court was never made aware of that interview. Thus, the record suggests the trial court was misled in concluding the Commonwealth’s discovery responses, and the in camera material reviewed, “described in a comprehensive way exactly what the victim said in her statements to Investigator Michael.” We do know, as the trial judge found from the documents he did review, that there were “material inconsistencies.”
The trial court concluded that despite the failure to provide the requested transcripts documenting known material inconsistencies, there was not a “reasonable probability” that their disclosure would have resulted in a different verdict. I disagree and now address that conclusion.
*549 B.
Recently, the Supreme Court of Virginia reversed a trial court, and this Court, where both had concluded that a failure to disclose impeachment evidence “does not rise to a reasonable probability that the result of the proceeding would have been different.” Workman v. Commonwealth, 272 Va. 633, 645, 636 S.E.2d 368, 375 (2006). That Court explained:
Stated differently, “[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555[, 1566], 131 L.Ed.2d 490 (1995). “[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.” United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, [3381,] 87 L.Ed.2d 481 (1985).
In Kyles, the Supreme Court of the United States made several holdings concerning the test of materiality. First, “a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).” Kyles, 514 U.S. at 434, 115 S.Ct. 1555 [at 1566]. Second, materiality is not a sufficiency of the evidence test. “A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.” Id. at 434-35, 115 S.Ct. 1555 [at 1566]. Third, a harmless error analysis is unnecessary once materiality has been determined. Id. at 435, 115 S.Ct. 1555 [at 1566]. Fourth, suppressed evidence must be “considered collectively, not item by item.” Id. at 436, 115 S.Ct. 1555 [at 1567]. Upon consideration of these factors, a reviewing court is *550 charged with the responsibility of determining if the suppression of evidence “undermines confidence in the outcome of the trial.” Bagley, 473 U.S. at 678, 105 S.Ct. 3375 [at 3381].
Id. at 645, 636 S.E.2d at 374-75.
The majority treats this case like a classic sexual assault ease pitting the testimony of the victim against that of the accused. In such a context, as the Virginia Supreme Court wrote in Clinebell v. Commonwealth, 235 Va. 319, 324, 368 S.E.2d 263, 265 (1988),[14]
*551 In sex offense cases, however, the weight of authority recognizes more liberal rules concerning impeachment of complaining witnesses. Accordingly, a majority of jurisdictions that have considered the issue hold that evidence of prior false accusations is admissible to impeach the complaining witness’ credibility or as substantive evidence tending to prove that the instant offense did not occur.
At trial, the following exchanges occurred upon cross-examination of complainant:
Q. But when you first talked to [Investigator] Michael, you said that you had been raped at the end of May. Do you remember telling him that?
A. No, I don’t remember.
Q. Do you deny telling him that?
A. No, I said I don’t remember.
In McGehee v. Perkins, 188 Va. 116, 125, 49 S.E.2d 304, 309 (1948), the Supreme Court of Virginia wrote:
The fact that his present testimony is inconsistent with his prior ... statement justifies the showing of the inconsistency, provided he is given an opportunity of correcting the *552 present testimony by directing his attention to the time, place and circumstances of the prior utterance. He cannot escape the consequences by saying he does not recall what he said on the prior occasion.
See also Currie v. Commonwealth, 30 Va.App. 58, 71-73, 515 S.E.2d 335, 342 (1999); Smith v. Commonwealth, 15 Va.App. 507, 511, 425 S.E.2d 95, 98 (1992).
Counsel for appellant simply could not impeach complainant about a fourth claim of being raped by appellant, without the transcript denied him by the Commonwealth. Moreover, absent the transcripts, counsel for appellant could not forcefully demonstrate and document to the jury, by using those transcripts, those inconsistencies admitted by the Commonwealth and later deemed “material” by the trial court. By analogy, if the Commonwealth possessed an exculpatory photograph, does it suffice for the Commonwealth to disclose only a description of what that photograph shows? Should not that photograph be produced, so a defendant may show it to a jury.[15]
*553 V.
This dissent has summarized in detail the evidence presented by the Commonwealth, resulting in appellant’s conviction for the July 24, 2003 rape and related charges. The first case quoted in this dissent was Agurs, 427 U.S. at 113, 96 S.Ct. at 2402. Returning to that quotation, we have summarized the evidence, first because we believe the trial court’s verdict “is already of questionable validity”; and, secondly, because we conclude the failure to provide appellant the transcripts (or any information concerning the intervening interviews of complainant) is “additional evidence [that] might be sufficient to create a reasonable doubt.” Id. A “reasonable probability,” under the standard of Brady, is a probability sufficient to undermine confidence in the outcome of the trial. I lack such confidence.
*554 “It is the province of the jury to pass upon such inconsistent statements and give or withhold their assent to the truthfulness of the particular statement.” Shelton v. Mullins, 207 Va. 17, 22, 147 S.E.2d 754, 757-58 (1966).[16] As Judge Benton wrote in his concurrence and dissent in Lemons v. Commonwealth, 14 Va.App. 1009, 1011 n. 1, 420 S.E.2d 525, 527 n. 1 (1992):
Where “the jury’s estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence,” evidence relevant to truthfulness, reliability, and credibility is as constitutionally material as evidence which goes directly to the question of guilt. Fitzgerald v. Bass, 4 Va.App. 371, 385, 358 S.E.2d 576, 584 (1987) (quoting Dozier v. Commonwealth, 219 Va. 1113, 1118, 253 S.E.2d 655, 658 (1979), aff'd en banc, 6 Va.App. 38, 366 S.E.2d 615 (1988), cert. denied sub nom. Fitzgerald v. Thompson, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)). “It is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant’s life or liberty may depend.” Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173[, 1177], 3 L.Ed.2d 1217 (1959). The information the Commonwealth failed to disclose was exculpatory and should have been disclosed.
In 1864, the Supreme Court of Virginia (then the Supreme Court of Appeals) wrote, in reversing a conviction:
I think therefore that it was competent for the accused, after asking the witness ... upon his cross-examination ... whether he had not said in his testimony before ... and if he denied having made such a statement, or said that he did not remember making it, to introduce evidence to prove that *555 he did make such a statement, to discredit the witness by impeaching his veracity or showing a defective memory.
Forde v. Commonwealth, 57 Va. (16 Gratt.) 547, 558-59 (1864).
That Court explained, “If the party were precluded by such reply from showing that he made such contradictory statements, the jury would be left in doubt whether they ever were made.” Id. at 558.
For the foregoing reasons I would reverse the convictions and remand for retrial, if the Commonwealth be so advised.

. On cross-examination complainant answered she had moved to Virginia from "California.”

. Apparently the bam is two-storied, with a "milking parlor" on the first floor, and open space on a second floor.

. The Emporium apparently is a form of market in which various vendors can rent space.

. In a written "voluntary statement" made to the police on July 24, 2003, complainant wrote that appellant “kept me at the bam against my will for 5 hours.”

. The disclosure does include, while not inconsistencies, that complainant said she had been raped "around the end of May,” that complainant did not report to her doctor she had been raped on January 19 or April 29, and that an assault and battery charge against appellant had been dismissed because complainant said there was "no contact” between her and appellant.

. In Lemons v. Commonwealth, 18 Va.App. 617, 446 S.E.2d 158 (1994), we wrote: "We have previously emphasized the importance of the prosecutor’s ethical duty to 'make [a] timely disclosure' of exculpatory material.” Id. at 621, 446 S.E.2d at 160-61 (quoting Humes v. Commonwealth, 12 Va.App. 1140, 1144 n. 2, 408 S.E.2d 553, 555 n. 2 (1991)). We justified this principle, stating, "The failure to carry out this duty reduces ‘the fact finding process ... to an exercise in brinkmanship.' " Id. (quoting Stotler v. Commonwealth, 2 Va.App. 481, 484, 346 S.E.2d 39, 41 (1986)). Finally, we explained, "The duty springs from a public prosecutor’s broader obligation to 'seek justice, not merely convict.’ ” Id. (quoting Virginia Code of Professional Responsibility EC 8-10 (1983)).
In the instant case, the Commonwealth told the trial court at the February 11, 2004 discovery hearing: "Judge, I know I get myself into trouble all the time because I don't have an open-file policy, but I don’t believe I’m required to give the victim’s statements unless it is exculpatory----"

. The majority relies in part upon three federal cases in support of their position. The dissent finds this reliance misplaced.
In United States v. Grunewald, 987 F.2d 531 (8th Cir.1993), the defendant was charged with income tax evasion. He sought the investigating IRS agent’s original notes; the government produced typewritten summaries. The trial court "had reviewed the notes as well as the typewritten summaries in camera, and [concluded] that there was no material difference between the two” and that they were "duplicative.” Id. at 535.
In United States v. Van Brandy, 726 F.2d 548, 551 (9th Cir.1984), defendant sought the entire FBI file of an informant because it "may contain exculpatory facts such as whether the government promised [the informant] immunity from future prosecution for his information.” The government provided typewritten summaries. The court concluded that the defendant's "showing of materiality and favorable content [wa]s marginal.” Id. By contrast, appellant's claim of materiality is not “marginal”; it is established by the trial court’s conclusion that the inconsistencies were "material.” Moreover, the Van Brandy court states, “The government, where doubt exists as to the usefulness of evidence, should resolve such doubts in favor of full disclosure, but its failure to do so must raise a reasonable possibility that it materially affected the verdict....” Id. at 552 (citations omitted) (emphasis added). It is that reasonable possibility that appellant asserts.
In United States v. Phillips, 854 F.2d 273 (7th Cir.1988), the defendant, admitting he and another robbed a bank, claimed he did so while acting as an FBI informant. He sought his entire confidential informant file. The government provided a typewritten summaiy. Before trial, defendant asked the court to compare the two and, further, to "address five specific questions regarding the contents of the informant file.” Id. at 276. The trial court received both and responded to the questions. The appellate court stated:
On the one hand, we are cognizant of defendant's expanded discovery rights under Brady. On the other, we have the government’s substantial interest in maintaining the secrecy of its files, which may contain not only the names of the informants themselves, but also information concerning ongoing investigations into other matters, government *551 investigation techniques, and the like. Thus, when a criminal defendant seeks to discover information contained in confidential government files, the trial court must balance the competing interests of the defendant and the government in deciding whether and in what form such discovery will be allowed.
After reviewing Phillips’s FBI informant file, we agree with the trial judge that the file contains no Brady material other than that reflected in the summary. The summary and the trial judge’s conscientious response to Phillips's March 6 letter together fairly and accurately reflect the contents of Phillips's informant file.
Id. at 277-78.
In the instant case, we are not dealing with the Commonwealth’s "substantial interest in maintaining the secrecy” of its confidential informant’s files. And, again, here the trial court found there were "material inconsistencies” in the transcripts it reviewed in camera, not that the transcripts contained "no Brady material.”
Finally, in each of the above cases, the trial court was provided, in camera, with all information the government possessed with respect to a Brady inquiry. We have established, we feel, that was not done in this case.

. Code § 19.2-268.1 states in relevant part that: "A witness in a criminal case may be cross-examined as to previous statements made by him [and] reduced into writing----" This dissent does not seek to reverse or limit our decision in Newton v. Commonwealth, 29 Va.App. 433, 442, 512 S.E.2d 846, 850 (1999), where we held that Code § 19.2-268.1
was not intended to supplement the discovery provisions of Rule 3A:11. Rather, it was intended to be used as an evidentiary rule by the trial court to order the production, inspection and use of a written statement once a witness has been cross-examined about the existence or contents of a prior statement.
In Newton we reversed the trial court for ordering the production by the defendant during voir dire of the jury of a transcript of a witness interview. We rejected the Commonwealth's argument that "the trial court properly exercised its authority under Code § 19.2-268.1 in requiring production of the written materials at an earlier time.” Id. at 444, 512 S.E.2d at 851. In so doing, we noted that "the trial judge recognized that the statement was useful for impeachment purposes only if the witness provided inconsistent testimony on direct examination.” Id. at 445, 512 S.E.2d at 851 (emphasis added). We further quoted the trial court as stating: “I don’t know what this particular witness is going to testify to ....” Id. at 446 n. 3, 512 S.E.2d at 852 n. 3 (emphasis in original).
*553 By contrast, in the instant case, the trial court knew, before trial, that there were exculpatory inconsistent statements in the transcripts because the Commonwealth admitted the same at the February 11, 2004 discovery hearing and provided in its discovery responses some of those inconsistencies.
In Scott v. Commonwealth, 7 Va.App. 252, 258, 372 S.E.2d 771, 775 (1988) , cert. denied, 490 U.S. 1095, 109 S.Ct. 2441, 104 L.Ed.2d 997 (1989) , we held that counsel is not permitted, when questioning the witness, to "paraphrase the questions and answers” in a transcript. Rather, the transcript itself shall be shown to the witness. Id. See also Patterson v. Commonwealth, 222 Va. 612, 617, 283 S.E.2d 190, 193 (1981) ("We can perceive no logical reason for requiring counsel to paraphrase a question propounded in a prior proceeding when the question can be more accurately called to the witness' attention by reading from a transcript of the proceeding."); Edwards v. Commonwealth, 19 Va.App. 568, 571-72, 454 S.E.2d 1, 3 (1995) ("[U]sing a transcript, if available, is the preferable means of laying an impeachment foundation____If a transcript is available, the court may require its production pursuant to the mandate of Code § 19.2-268.1 even if there are other means of impeachment.”).
In the instant case, where the trial court knew before trial that the interview transcript contained exculpatory inconsistent statements, we believe that knowledge renders the transcript discoverable. Accordingly, while the above cited decisions addressing Code § 19.2-268.1 are instructive with respect to the preference of using an available transcript for impeachment, we do not believe our position in this case limits the application of this Court’s earlier decisions concerning that statute.

. We recognize that "When a trial judge, sitting as ‘both trier of fact and arbiter of law,’ finds the Brady evidence inconsequential, there can be 'no logical possibility’ that its earlier disclosure ‘would have altered the outcome of the case.’ " Deville v. Commonwealth, 47 Va.App. 754, 757, 627 S.E.2d 530, 532 (2006) (quoting Stroik v. State, 671 A.2d 1335, 1340 (Del.1996)). That conclusion, however, and the deference it properly recites, should not be afforded to a trial judge hearing a post jury trial Brady motion.